IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF ARKANSAS
FAYETTEVILLE DIVISION

LORI L. BANKS                                          PLAINTIFF

V.                              NO. 09-5197

MICHAEL J. ASTRUE, Commissioner
of Social Security                                     DEFENDANT

## MEMORANDUM OPINION

    Plaintiff, Lori L. Banks, brings this action pursuant to 42 U.S.C. §405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for a period of disability and disability insurance benefits

(DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI)

under Title XVI of the Act.  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. §405(g).

## Procedural Background

    Plaintiff filed her applications for DIB and SSI on July 12, 2007 (Tr. 109-119), alleging

disability since May 10, 2005.  (Tr. 109, 115).[1]  Plaintiff's applications were denied initially and

upon reconsideration.  (Tr. 71-76, 80-83).  Pursuant to Plaintiff's request, a hearing was held

before an Administrative Law Judge (ALJ) on October 2, 2008, where Plaintiff and a Vocational

Expert (VE) testified.  (Tr. 21-54).  On November 26, 2008, the ALJ entered his decision,

---

[1]The Court notes that Plaintiff previously filed applications for SSI and DIB on October 30, 2003, and the ALJ
entered an unfavorable decision.  Plaintiff appealed the decision to the district court, and on March 9, 2009,
United States Magistrate Judge Barry A. Bryant entered a Memorandum Opinion and Judgment, reversing and
remanding the matter for a full Polaski analysis.  (Tr. 7-15).  This was entered after the entry of the ALJ's
unfavorable decision in the present case.

denying Plaintiff's request for a determination of disability. (Tr. 59-70) . The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; fibromyalgia; migraines; and anxiety disorder. (Tr. 64). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with certain limitations. Specifically, the ALJ found that Plaintiff could sit for a total of 6 hours during an 8-hour workday and could stand and walk for a total of 2 hours during an 8-hour workday. (Tr. 65 ). The ALJ further found that Plaintiff could perform unskilled work where interpersonal contact was incidental to the work performed. (Tr. 65). The VE found that there were jobs, such as assembly worker, machine tender, and surveillance systems monitor, that Plaintiff would be able to perform. (Tr. 68). Plaintiff's request for review was denied by the Appeals Council on July 10, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 1-3).

**Evidence Presented**

Plaintiff was born in 1963, and received her GED in 1995. (Tr. 109, 147). Plaintiff's longest period of employment was as a waitress from 1983 until 2005. (Tr. 143). Plaintiff had her gallbladder removed in 2005, and her appendix removed in 2007. (197, 249).

Plaintiff began seeing her treating physician, Dr. Craig Milam, at St. John's Clinic, in October of 2004, for migraine headaches. (Tr. 298). On December 6, 2004, Plaintiff reported that her migraines were better on Topamax, but she also complained of severe back pain between her shoulder blades. (Tr. 296). Both of her hands were numb and her legs were also numb bilaterally. (Tr. 296). Over the next two years, Dr. Milam treated Plaintiff for a variety of

-2-

ailments, such as:  multiple pain syndrome problems;  widespread musculoskeletal pain;  some memory loss and fatigue (Tr. 293);  irritable bowel syndrome with abdominal pain;  numbness of hands, arms and feet (Tr. 281, 290);  continued migraines;  acute anxiety;  paresthesias of hands;  known bulging disk in the cervical spine (Tr. 289);  sleep disturbance;  chronic neck pain and back pain (Tr. 286);  low back pain (Tr. 283);  acute low back strain/sprain with trigger points (Tr. 282); neck pain with known bulging discs of neck;  degenerative disk disease-cervical spine and lumbar spine;  fibromyalgia, with exacerbation;  chronic anxiety or depression (Tr. 278);  left lateral chest wall pain (Tr. 276);  shortness of breath (Tr. 274);  peptic ulcer disease (Tr. 265, 267, 269);  constipation; and history of costochondritis with old rib fractures (Tr. 263). As late as February 27, 2008, Dr. Milam wrote a letter "To Whom It May Concern," stating that his patient, Lori Banks, "has Fibromyalgia and it is severe enough to require her to use a cane for walking."  (Tr. 332).

On March 21, 2005, Plaintiff saw Dr. Michael W. Morse, of Neurological Associates, PLC, as a referral from Dr. Milam.  (Tr. 256-258).  He noted that Plaintiff's migraines had decreased due to the Topamax, was on 50-75 mg. at bedtime, and that she was having some "increasing numbness and tingling of her hands and feet associated with that." (Tr. 256).  Her neck pain went down to her right arm and she had minimal weakness in her grip in her right arm. She also had some numbness and tingling in her hands and feet prior to the Topamax, and it was worse on the right side.  (Tr. 256).  A nerve conduction velocity test was normal.  (Tr. 257).  She had disc bulges at C3-4 and C4-5 and some radicular pain in her right arm.  However, Dr. Morse noted that it was not  significant enough to warrant surgery, and noted that she had benefitted from chiropractic and physical therapy in the past, and felt it would be reasonable to repeat that.

-3-

(Tr. 257).

In August of 2005, Plaintiff went to the Emergency Room two times in one week for low back pain. (Tr. 283). Dr. Milam started her on Oxycodone with Dextromethorphan. (Tr. 282). On August 25, 2005, Plaintiff complained of numbness in her hands and arms and also complained that her neck was sore. She had been on pain medications. On September 15, 2005, Dr. Milam noted that Plaintiff had benefitted previously from taking Topamax for her migraines but had not been able to afford to buy any lately, and was having some daily headaches. (Tr. 280). On November 2, 2005, Plaintiff noted that physical therapy had not helped and also told Dr. Milam that she was having trouble paying for any medications, including Topamax. (Tr. 279).

On August 28, 2006, Dr. Milam saw Plaintiff for follow-up on stomach issues, and left wrist pain, with suspected peptic ulcer. He noted that Plaintiff had marked fibromyalgia exacerbated by her depression. (Tr. 263). Dr. Milam further noted:

> The patient is a challenge to treat. She is a chronic smoker with no insurance and social problems, some which she is not revealing. I definitely wonder if she has been abused at some point by her husband or other people. She denies any of that on previous questioning. She needs help from St. John's for Cymbalta and I directed her to the proper people to help her.

(Tr. 263). Dr. Milam later noted that Plaintiff was in the process of being helped with her medications by St. John's, mainly with Cymbalta, Advair, and Topamax. (Tr. 260).

On July 27, 2007, in a "Treating Physician's Report for Migraine Headaches," Dr. Milam noted that the location of Plaintiff's headache was bilateral and back of neck, which occurred every other day, requiring ER visits for a narcotic injection, but which she could not afford. (Tr. 255). He further noted that Topamax and SOMA with Ultram made the headaches bearable, and

-4-

that Plaintiff could not drive or work because she would have to lie down until the pain from the migraines went away.  (Tr. 255).

On August 20, 2007, a Physical RFC Assessment was completed by Dr. Alice M. Davidson.  (Tr. 299-306).  Dr. Davidson gave Plaintiff a primary diagnosis of fibromyalgia and a secondary diagnosis of migraines.  (Tr. 299).  She found that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimited, other than as shown for lift and/or carry.  (Tr. 300).  No postural, manipulative, visual, communicative, or environmental limitations were established.  (Tr. 301-303).

On August 27, 2007, a Psychiatric Review Technique was completed by Paula Lynch. (Tr. 311-324).  She found that the evidence did not establish the presence of the "B" or "C" criteria, and Plaintiff was assessed with a non-severe mental rating.  (Tr. 323).

On December 20, 2007, a MRI was performed on Plaintiff's cervical spine without contrast and the impression was: "Spondylosis and small disc protrusion cause mild cord impingement on the right side at C4-C5.  This could affect the right C5 nerve root.  Mild changes were noted elsewhere, without appreciable neural impingement."  (Tr. 334).  On that same day, a MRI was performed on Plaintiff's lumbar spine without contrast and the impression was: "Posterior annular tear at L4-L5 and probable small bilateral ovarian cysts, otherwise unremarkable exam."  (Tr. 335).

On August 3, 2008, Plaintiff reported to the Washington Regional Medical Center, complaining of sciatic nerve pain.  (Tr. 361).  She stated that she was having difficulty walking, and that she had taken all of her medications, but they were just not working.  (Tr. 361).  She

-5-

appeared uncomfortable, although her gait was noted as normal.  A MRI of her lumbar spine revealed mild lumbar spondylosis with a small shallow central disc protrusion at L4/5.  There was no canal stenosis or significant neural foraminal narrowing.  (Tr. 360).

On August 8, 2008, when Plaintiff presented to the Family Medical Center, she walked in a flexed position and her range of motion was less than 15 degrees paraspinal tenderness.  (Tr. 338).  On August 10, 2008, Plaintiff was still complaining that her pain was not well controlled.  (Tr. 341).

At the hearing on October 2, 2008, Plaintiff stated that she used a cane once in a while.  (Tr. 28).  She also said that the medications she was taking sometimes made her eyes blurry.  (Tr. 29).  She testified that in the mornings, she shook all the time and on some days, she could not close her hands without it hurting, and could not grip her coffee cup.  (Tr. 34-35).  She stated that she hurt a lot in her neck, shoulders and arms, and that she took Soma and Ultram for pain.  (Tr. 34-35).  She stated that without medication, her neck and shoulder pain was a "10" and that it was a "5" or "6" when taking medications.  (Tr. 35).  She stated that sometimes her medication made her dizzy or tired, and that she had blurred vision all the time.  (Tr. 36).  Plaintiff testified that she could drive occasionally, but that sitting caused her the most difficulty because her lower back started shooting pains and she would get muscle spasms in her side and back.  She stated that driving hurt her neck a lot, her arms got really tired and hurt, and her hands went numb so that it was hard to hold on to the steering wheel.  Plaintiff further testified that Topamax was prescribed for her migraines and that she was having migraines a couple of times a month which lasted about two days "with taking Topamax." (Tr. 43).  She stated that sometimes the medicines helped, but sometimes they did not.  (Tr. 45).

-6-

With respect to daily activities, Plaintiff testified that although she is able to groom herself, she could do very little around the house. (Tr. 33). She stated that she drove occasionally, got her nine year old ready for school, took her medications and sometimes did the dishes. (Tr. 32). She is not able to vacuum, has problems lifting a gallon of milk, barely sleeps at night, cooks about twice a week, and sits on the porch. (Tr. 33, 40, 42). She stated that she had trouble picking up things and writing things. (Tr. 47).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v.

Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**Discussion**

In his decision, the ALJ took "note of the fact that the claimant's medically documented degenerative disc disease, fibromyalgia, migraines, and anxiety disorder have all been conservatively treated and controlled with medications."  (Tr. 66).  He found that Dr. Morse noted that Plaintiff had benefitted from chiropractic and physical therapy in the past and stated it would be reasonable to repeat that.  However, Dr. Morse's evaluation was conducted on March

-8-

21, 2005, and on November 2, 2005, Plaintiff advised Dr. Milam that she had done physical therapy but had stopped because it had not helped. (Tr. 279). In addition, an August 3, 2008 record from the Emergency Room at Washington Regional Medical Center indicated that she had taken all of her medications but that they were "just not working." Finally, at the hearing, Plaintiff testified that without medication, her neck and shoulder pain was a "10" and a "5" or "6" when taking medication; that without medication, the pain in her arms was a "10" and with medications, a "5" or "6", and that the pain in the back of her hands was a "7" to "9" and dropped to "5" with medication. (Tr. 34-36). This can hardly be considered "controlled" with medication. Furthermore, Plaintiff testified that sometimes her medications made her dizzy or tired and gave her blurred vision. (Tr. 36). The ALJ failed to address these more recent records and side effects. Instead, he concluded that Plaintiff's degenerative disc disease and any related limitations were not severe to a degree that would limit activities beyond the scope of the RFC as determined in his decision.

With respect to Plaintiff's fibromyalgia, the ALJ noted that Plaintiff received trigger point injections for possible fibromyalgia in 2005, but then noted that Dr. Milam stated that her fibromyalgia was severe enough to require her to use a cane for walking. The ALJ then summarily concluded that Plaintiff's fibromyalgia and any related limitations were not severe to a degree that would limit activities beyond the scope of the RFC as determined in the decision. Fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling. Pirtle v. Astrue, 479 F.3d 931, 935 (8th Cir. 2007, citing Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005)(per curiam). The record is replete with Plaintiff's continuing complaints of severe, chronic pain, as early as 2004, as well as the limited effects of medications. See  Leckenby v.

Astrue, 487 F.3d 626 (8th Cir. 2007)(the ALJ erred by disregarding the opinions of treating physicians regarding Leckenby's need for rest periods). "Fibromyalgia is a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues. Diagnosis is clinical. Treatment includes exercise, local heat, and drugs for pain and sleep." See The Merck Manual, 321 (18th Edition, 2006).

> In fibromyalgia, symptoms and signs are more generalized, and there is no specific histologic abnormality. It sometimes occurs in patients with systemic rheumatic disorders, which complicates the diagnosis. ...
> Stiffness and pain in fibromyalgia frequently begin gradually, diffusely and with an achy quality. Symptoms can be exacerbated by environmental or emotional stress, poor sleep, trauma, exposure to dampness or cold, or by a physician who give the patient the incorrect message that it is "all in the head." Patients tend to be stressed, tense, anxious, fatigued, striving, and sometimes depressed. Many patients also have irritable bowel symptoms or tension headaches.
> Fibromyalgia is suspected in patients with generalized pain and tenderness, especially disproportionate to the physical findings; with negative laboratory results despite widespread symptoms; or when fatigue is the predominant symptom. ...The diagnosis is supported by explicit tender points and other findings, which comprise diagnostic criteria....Chronic fatigue syndrome can cause similar generalized myalgias. ...

Id.

In the present case, the only Physical RFC Assessment in the record was conducted by a non-treating physician who examined Plaintiff one time. In a case such as this, the Court believes the ALJ was obligated to contact Plaintiff's treating physician, who has been treating Plaintiff for four years, for an assessment of how Plaintiff's impairments, particularly her fibromyalgia, limited her ability to engage in work-related activities. See Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002).

With respect to Plaintiff's migraines, although Topomax did improve Plaintiff's

-10-

migraines to a certain degree, the Plaintiff testified that her migraines occurred a couple of times a month and lasted about two days, even when she took Topamax.  Although the ALJ noted Dr. Milam's statement that Plaintiff could not drive or work and had to lie down until the pain went away, he nevertheless concluded that Plaintiff's migraines and any related limitations were not severe to a degree that would limit activities beyond the scope of the RFC as determined in the decision.  The ALJ must therefore not have given the treating physician's opinion much credit, if any, with respect to Plaintiff's migraines, although he never specifically stated such.  In Owen v. Astrue, 551 F.3d 792 (8th Cir. 2008), the Court stated that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to "'controlling weight' if the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Id. at 798, citing 20 C.F.R. §§ 404.1527(d)(2).

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

Id., citing to 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

In the present case, the ALJ did not discuss why he did not credit Dr. Milam's opinion regarding Plaintiff's migraine headaches, or the impact they would have on Plaintiff's ability to do work-related activities.  He merely concluded that Plaintiff's migraines and any related limitations were not severe to a degree that would limit Plaintiff's activities beyond the scope of the RFC as determined in his decision.

-11-

The Court finds that there is not substantial evidence to support the ALJ's decision and believes that this matter should be reversed and remanded to the ALJ in order for him to obtain a Physical RFC Assessment from Dr. Milam, and to have Plaintiff examined by a Rheumatologist and obtain a Physical RFC Assessment from the Rheumatologist as well, in order to determine the severity of Plaintiff's fibromyalgia.  The ALJ should thereafter re-evaluate Plaintiff's RFC in light of the newly received information.

IT IS SO ORDERED this 16th day of September, 2010.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-12-